UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

In re:

TOUGHER INDUSTRIES, INC.,                           Case No. 06-12960
                                                    Chapter 11(Main Case)

                                    Debtor.

-------------------------------------------------------------      Jointly Administered

In re:
                                                    Case No. 07-10022
TOUGHER MECHANICAL, INC.,                           Chapter 11

                                    Debtor.

-------------------------------------------------------------

LEE E. WOODARD, CHAPTER 11 TRUSTEE,

                                    Plaintiff,

        -against-                                   Adv. No. 08-90161


PSEG ENERGY TECHNOLOGIES ASSET
MANAGEMENT COMPANY, LLC, successor-in-
interest to PSEG Energy Technologies, Inc., and
PSEG ENERGY HOLDINGS, LLC.,

                                    Defendants.

-------------------------------------------------------------

APPEARANCES:

Harris Beach PLLC                                   David M. Capriotti, Esq.
*Attorneys for Plaintiff*
Suite 200
333 West Washington Street
Syracuse, NY 13202

McCarter & English LLP                              Eduardo J. Glas, Esq.
*Attorneys for Defendants*
245 Park Avenue
New York, NY 10167

Hon. Robert E. Littlefield, Jr., Chief United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

This adversary proceeding emanates from the 2003 prepetition leveraged buyout ("LBO") of the Debtor's predecessor in interest and the Debtor's subsequent bankruptcy filing in 2006. The §1104 trustee seeks to avoid and recover, as fraudulent conveyances, the buyout payments made to the defendants for Debtor's stock pursuant to §§ 544, 548, and 550 and §§ 273 and 274 of the New York Debtor and Creditor Law ("NYDCL").[1] Currently before the court is the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056.

## PROCEDURAL AND FACTUAL HISTORY

The procedural and factual history germane to this motion is undisputed.[2] Tougher Industries, Inc. filed for bankruptcy relief under Chapter 11 on November 3, 2006. By order entered November 22, 2006, the court appointed Lee E. Woodard, Esq. trustee pursuant to § 1104 (the "Trustee"). The Trustee caused Tougher Mechanical, Inc. to file a voluntary chapter 11 petition on January 3, 2007. The cases of Tougher Industries, Inc. and Tougher Mechanical, Inc. (collectively, "Debtor" or "Tougher") are being jointly administered pursuant to Rule 1015(b) by order entered March 6, 2007.

In August of 2003, PSEG Energy Technologies, Inc., predecessor in interest to PSEG Energy Technologies Asset Management Company, LLC (collectively, "Defendants" or "PSEG"), and Jacob George Associates ("JGA") entered into a Stock Purchase and Sale Agreement ("SPSA") by which JGA acquired all of the stock in the Debtor from PSEG for a purchase price of $4.1 million. PSEG was a New Jersey limited liability corporation that held

---

[1] Unless otherwise noted, all statutory references are to Title 11 of the United States Code (11 U.S.C. §§ 101-1532), and all rule references are to the Federal Rules of Bankruptcy Procedure.

[2] The Trustee indicates in his brief that he does not disagree with the Defendants' Statement of Material, Undisputed Facts Pursuant to Rule 56.1 of the Federal Rules of Civil Procedure (ECF No. 75). (Trustee's Mem. in Opp'n to Defs.' Mot. for Summ. J. 3, n. 1 (ECF No. 86).)

operating companies which provided heating, ventilation, and air-conditioning ("HVAC") systems and services. JGA was a New Jersey corporation and, after the stock purchase, the purported parent company of the Debtor and the sole shareholder of the Debtor's stock.

The stock purchase was structured as a LBO, with $500,000 payable at closing and the remaining $3.6 million accounted for by the execution of a promissory note. The note provided for the following payments: (1) a $200,000 installment by November 3, 2003; (2) a second installment of $2.1 million by November 30, 2003; and (3) the balance in equal installments over a 38 month period. The transaction was secured by an unconditional corporate guaranty from the Debtor (the "Corporate Guaranty"), a security interest in all of the Debtor's assets, and a personal guaranty from Steven Shaw, a principal of JGA.

Although the SPSA required a total of $4.1 million to be paid by JGA, the amount actually received by PSEG on account of the sale was $3,604,701. The first installment of $500,000 was paid at the closing in or about October 2003. While it is unclear whether the first payment of $500,000 was made by the shareholders of JGA, or by JGA itself, it is undisputed that it was not made directly by the Debtor. The remaining three payments were received by PSEG by wire transfer. The second installment in the amount of $200,000 was credited to PSEG's account at Chase on or about November 4, 2003. The third payment in the amount of $2,100,000 was made to PSEG's account at Chase on or about November 30, 2003. This wire transfer was done in connection with the Debtor's $2.3 million term loan and a $3 million revolving line of credit from Hudson River Bank & Trust Company. To facilitate the Debtor's financing with Hudson River Bank &Trust Co., PSEG agreed to subordinate its first lien on the Debtor's assets to the bank's lien. The amount of the last installment, $804,701, was pursuant to a settlement agreement reached between the parties in 2006. The agreed upon last payment was

wired to PSEG's account at Chase on or about June 23, 2006. This was done as part of the

Debtor's refinancing of its existing Hudson River Bank & Trust Co. loan with a new $3.1 million

term loan and a $4 million revolving line of credit from Berkshire Bank.

On October 21, 2008, the Trustee commenced this adversary proceeding with the filing

of a complaint to avoid and recover the transfers made to PSEG. On March 24, 2010, the

Trustee filed his Second Amended Complaint, after the court had dismissed his two prior

complaints on PSEG's motions to dismiss. PSEG filed a motion to dismiss the Second Amended

Complaint in lieu of an answer on April 21, 2010. On December 26, 2012, the court issued a

Memorandum-Decision and Order granting in part and denying in part PSEG's motion to

dismiss. The Trustee's four causes of action based upon claims of constructive fraudulent

conveyances surrounding the LBO survived the motion to dismiss. The remaining causes of

action sounding in actual fraudulent intent were dismissed. PSEG filed an answer denying many

of the allegations in the complaint and asserting twelve affirmative defenses, including that the

complaint is barred under § 546(e). On March 5, 2013, PSEG filed its motion for an order

granting summary judgment in its favor and dismissing the remaining causes of action. At the

conclusion of oral argument on April 10, 2013, the court permitted the parties to file further

memoranda of law in support of their positions. Following those submissions, the matter was

taken under advisement.

## ARGUMENT

PSEG presents three arguments to support its position that the Trustee's remaining causes

of action should be dismissed. First, PSEG argues that, except for the initial $500,000, the

payments it received for the Debtor's stock in the LBO cannot be recovered because they were

"settlement payments" made by or to a financial institution and, thus, are protected from

4

avoidance by § 546(e). Second, PSEG asserts that the initial transfer of $500,000 at the closing was not property of the Debtor and, therefore, cannot be recovered by the Trustee. Lastly, PSEG contends that the Debtor's payments for the stock was in satisfaction of, on a dollar for dollar basis, the antecedent debt created by the Corporate Guaranty and, therefore, were supported by reasonably equivalent value.

In response, the Trustee argues that § 546(e) is inapplicable because the settlement payments did not pass from the Debtor through a financial intermediary to PSEG. The Trustee asserts that to hold otherwise would be inconsistent with the legislative purpose of this provision and not satisfy the statutory requirement that the settlement payments be made "by or to" a financial institution. The Trustee also asserts that the initial transfer of $500,000 at closing is avoidable even though the Debtor was not the direct source of the funds because the $500,000 payment was meant to be a loan to the Debtor. As a result, the Trustee claims that the $500,000 should be considered an asset of the Debtor. Additionally, the Trustee contends that all four of the transfers were not made in exchange for reasonably equivalent value because the execution of the Corporate Guaranty, in and of itself, was avoidable as a fraudulent conveyance and, therefore, it could not create a valid antecedent debt which could later be satisfied.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Fed. R. Bankr. P. 7056. It is the movant's burden to show that no genuine factual dispute exists. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted). In reviewing a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. *Id.* If the moving party meets its initial burden

and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts asserted by the movant. Fed. R. Civ. P. 56(e)(2); Fed. R. Bankr. P. 7056. While the Trustee does not contend that there are any disputed facts, he asserts the Defendants' summary judgment motion should be denied because they have not established as a matter of law that they are entitled to the relief requested.

### The First $500,000 Transfer

Sections 544 and 548(a) give a trustee standing to avoid fraudulent transfers. Section 544 enables a trustee to avoid and recover only a "transfer of property *of the debtor*," 11 U.S.C. § 544(a), or "of an interest *of the debtor* in property, 11 U.S.C. § 544(b) (emphasis added). Similarly, § 548(a) limits the trustee to causes of action to avoid transfers of "an interest *of the debtor*." 11 U.S.C. § 548 (emphasis added). The initial $500,000 payment made to PSEG at the closing was contributed by the shareholders of JGA, or by JGA itself. As the $500,000 was not property of the Debtor, it is not the proper subject of a fraudulent transfer claim by the Trustee. While the Trustee attempts to argue this advance was meant as a loan to the Debtor, there is nothing in the record indicating that the funds went from JGA or its shareholders to the Debtor and then to PSEG, nor is there anything in the record evidencing the debt.

### Applicability of § 546(e) Safe Harbor Provision to the Remaining Transfers

Section 546(e) prohibits a bankruptcy trustee from bringing constructive fraudulent conveyance claims to unwind certain securities transactions. Congress enacted § 546(e) in order to provide certainty to securities transactions and, in turn, to enhance the stability of the nation's financial markets. *See* H.R.Rep. No. 95-595, at 391 (1977); *see Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 334 (2d Cir. 2011) (Congress enacted § 546(e) as a means of "'minimiz[ing] the displacement caused in the . . .

securities markets in the event of a major bankruptcy affecting those industries.'" (quoting H.R.

Rep. 97-420, at 1 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583)).

> The safe harbor limits this risk by prohibiting the avoidance of "settlement payments" made by, to, or on behalf of a number of participants in the financial markets. By restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands 'at the intersection of two important national legislative policies on a collision course-the policies of bankruptcy and securities law.'

*In re Enron Creditors Recovery Corp.*, 651 F.3d at 334 (quoting *In re Resort Int'l, Inc.*, 181

F.3d 505, 515 (3d Cir. 1999)).

Section 546(e) provides, in relevant part,

> Notwithstanding sections 544 . . . 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer that is a . . . *settlement payment*, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution financial participant, or securities clearing agency, in connection with a *securities contract*, as defined in section 741(7) . . . except under section 548(a)(1)(A) of this title.

11 U.S.C § 546(e) (emphasis added).

A securities contract is defined under the Bankruptcy Code as "a contract for the

purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). The Bankruptcy Code's

definition of a "settlement payment" is a "preliminary settlement payment, a partial settlement

payment, an interim settlement payment, a settlement payment on account, a final settlement

payment, or any other similar payment commonly used in the securities trade." 11 U.S.C

§ 741(8). Several circuit courts have described the definition of "settlement payment" as

"extremely broad." *QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 549

(6th Cir. 2009); *Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.)*, 564

F.3d 981, 985 (8th Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181

F.3d 505, 515 (3d Cir. 1999); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*,

952 F.2d 1230, 1237 (10th Cir. 1991). The Second Circuit has interpreted this circular definition

to include "the transfer of cash or securities made to complete a securities transaction." *In re*

*Enron Creditors Recovery Corp.*, 651 F.3d at 334; *see In re Resorts Int'l, Inc.*, 181 F.3d at 515;

*In re Kaiser Steel Corp.*, 952 F.2d at 1240.

      The question presented to the court is whether the payments made to PSEG as part of the

LBO fall within the statutory definitions to gain protection under § 546(e) from the Trustee's

avoidance actions.  Courts have held that a "payment for shares during an LBO is obviously a

common securities transaction," and, thus, "a settlement payment for purposes of § 546(e)." *In*

*re Enron Creditors Recovery Corp.*, 651 F.3d at 336; *In re Resorts Int'l*, 181 F.3d at 515-16.

Additionally, nothing in the language of § 546(e) limits its application to publically traded

securities. *In re QSI Holdings, Inc.*, 571 F.3d at 550 (citing *Contemporary Indus. Corp.*, 564

F.3d at 986).  Agreeing with its sister circuit courts, the Second Circuit held that application of

the safe harbor to privately held securities, as well as public securities, was consistent with the

statute's legislative history as "undoing long-settled leveraged buyouts would have a substantial

impact on the stability of the markets, even though only private securities were involved . . . ."

*In re Enron Creditors Recovery Corp.*, 651 F.3d at 338-39 (citing *In re Plassein Int'l Corp.*, 590

F.3d at 258; *In re QSI Holdings*, 571 F.3d at 550; *Contemporary Indus. Corp.*, 564 F.3d at 987.)

      Here, there is no disagreement that "settlement payments" were made in connection with

a "securities contract."  Rather, the dispute surrounds whether the transfer was "made by or to . .

. [a] financial institution."  More specifically, whether in order for the settlement payments to

qualify for refuge under the safe harbor they must pass from the purchaser through a financial

intermediary to the seller.

In examining what role a financial institution must play in the transaction for it to be

afforded the safe harbor protection contained in § 546(e), the Second Circuit held in *Enron*

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.* that payments for securities were "settlement

payments" even where no financial intermediary acquired a beneficial interest in the securities.

651 F.3d at 338. The Second Circuit recently reiterated that it follows the Third, Sixth, and

Eighth Circuits,[3] in holding that any transfer to a financial institution may qualify for protection,

even if it is only serving as a conduit or intermediary. *Quebecor World (USA), Inc. v. Am.*

*United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94, 99 (2d Cir. 2013) (citing *In*

*re QSI Holdings, Inc.*, 571 F.3d at 551; *Frost*, 564 F.3d at 987; *In re Resorts Int'l, Inc.*, 181 F.3d

at 516). Looking to the plain language of the statute, the Second Circuit concluded that "a

transfer may be either 'for the benefit of' a financial institution or 'to' a financial institution, but

need not be both." *In re Quebecor World (USA) Inc.*, 719 F.3d at 100. Thus, "'the absence of a

financial intermediary that takes title to the transacted securities during the course of the

transaction is [not] a proper basis on which to deny safe-harbor protection.'" *Id.* at 98 (quoting

*In re Enron*, 651 F.3d at 338).

Here, the payments did not pass from the Debtor through a financial intermediary to

PSEG. Instead, the payments at issue were made directly from the Debtor to PSEG's bank

account. There was no clearing house or conduit in the middle of the transaction. Such was also

the case in *AP Services LLP v. Silva*, 483 B.R. 63 (S.D.N.Y. 2012). *Silva* involved the LBO of a

family-owned long-term care pharmacy. The Silva family sold their shares to a purchasing

company. The purchaser leveraged the assets of the pharmacy to obtain loans to pay for the

stock. A year after the LBO, the purchaser violated its loan covenants. Three years after the

---

[3] The Eleventh Circuit has held that the financial institution must take a beneficial interest in the transferred funds or securities for the safe harbor to apply. *Munford v. Valuation Research Corp. (In re Munford, Inc.)*, 98 F.3d 604, 610 (11th Cir. 1996).

LBO, the purchaser filed for bankruptcy and was liquidated. The trustee sought to recover the payments made to the Silva family for their stock. The Silva family claimed they were protected by § 546(e). The trustee argued § 546(e) was inapplicable because the funds had been wired directly to the seller's account without the use of an intermediary.

Looking at the plain language of the statute, the statutory definition of financial institution, and construing the term "settlement payment" "extremely broad[ly]," the District Court for the Southern District of New York held that "nothing in the language of the statute or the post-*Enron* case law indicates that an intermediary is necessary to trigger the safe harbor [defense]." *AP Services LLP v. Silva*, 483 B.R. at 69. In addressing the legislative purpose of § 546(e), the district court found the reasoning of *Enron* applicable and stated that the negative effects of undoing long-settled LBOs would be "equally true regardless of whether a payment passed through a financial intermediary." *Id.*

*Brandt v. B.A. Capital Co., LP (In re Plassein Int'l Corp.)*, 590 F.3d 252 (3d Cir. 2009), a case relied upon by the district court in *Silva*, also involved LBO payments made directly to shareholders' private bank accounts via wire transfer. The Third Circuit rejected the argument that settlement payments must travel through the settlement system, that is the system of intermediaries and guarantees usually employed in securities transactions, and found financial institutions were implicated in the transfers, as debtor's bank transferred the buyout funds to the shareholders' banks. *Id.* at 258.

The Trustee disagrees with the holding of *Plassein* and *Silva*, and urges that the district court extended the safe harbor provision too far. The court finds the holdings of *Silva* and *Plassein* persuasive. Nowhere in the plain language of § 546(e) is there a requirement that a financial intermediary act as a conduit or take a beneficial interest in the transfer. The safe

harbor provision merely requires that a settlement payment be "made by or to . . . [a] financial institution. . . ." 11 U.S.C. § 546(e). As defined in the Bankruptcy Code, a financial institution includes "a Federal reserve bank, or an entity that is a commercial or savings bank." 11 U.S.C. § 101(22). In this case, the second, third and fourth transfers were wired from the Debtor's bank account directly to the Defendants' bank account. Thus, the settlement payments were "made to a financial institution." "'Courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *Sec. Investors Prot. Corp. v. Maddoff Inv. Sec., LLC*, 476 B.R. 715, 721-22 (S.D.N.Y. 2012) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). If Congress had intended that the safe harbor provision only be applied to transactions involving financial intermediaries, it would have explicitly included that requirement in the language of the statute.

The Trustee also advances the argument that the safe harbor should not be applied here because given the relatively small amount of money involved in the transaction, avoidance of these transfers would not have a substantial impact on the financial markets. This argument was rejected by the district court in *Silva*, and the court finds it unavailing as well. *AP Services LLP v. Silva*, 483 B.R. at 70. The plain language of the statute does not provide a threshold amount below which the safe harbor of § 546(e) is not available. The Trustee's position would add a requirement that a factual determination be made as to whether the dollar amount of a transaction would have an impact on the financial markets. The Second Circuit rejected a similar argument in *Enron*. In *Enron*, the plaintiff argued that § 546(e) was inapplicable because the subject payments were not "settlement payments" on the basis that they were not "similar payment[s] commonly used in the securities trade" as defined under § 741(8). The Second Circuit refused to adopt a construction of § 546(e) that would make application of the safe harbor depend on a

factual determination in each case regarding the "commonness" of a given transaction. *In re Enron Creditors Recovery Corp.*, 651 F.3d at 336. The Second Circuit indicated that such an interpretation, "would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area where certainty and predictability are at a premium." *Id.* The Second Circuit's rationale is equally applicable here.

For all of the above reasons, the second, third, and fourth LBO payments PSEG received for the Debtor's stock are within the scope of the § 546(e) safe harbor and, thus, shielded from avoidance by the Trustee.[4]

### CONCLUSION

Defendants' motion for summary judgment is GRANTED, and the Second Amended Complaint is dismissed.

It is SO ORDERED.

Dated: October 10, 2013

/s/ Robert E. Littlefield, Jr.
Robert E. Littlefield, Jr.
Chief United States Bankruptcy Judge

---

[4] As the court has found that § 546(e) prohibits the Trustee from asserting a constructive fraudulent conveyance claim to unwind the LBO payments, it need not address Defendants' remaining argument that the transfers were supported by reasonably equivalent value.

12